HON. WILLIAM H. HUNT,  
HON. WILLIAM T. PIGOTT, } Associate Justices.

MATTIE E. BURNS, RESPONDENT, *v.* MARY S. SMITH, ET AL., APPELLANTS.

[Submitted March 30, 1898. Decided July 5, 1898.]

*Equity Jurisdiction—Agreement to Devise—Specific Perform-ance—Evidence—Res Gestae.*

1. EQUITY JURISDICTION—*Agreement to Devise—Specific Performance.*—Under Section 11, Article 8, of the State Constitution, which provides that district courts "have original jurisdiction in all cases in law and equity where the claim is for fifty dollars or more," the district court, sitting as a court of equity, has jurisdiction to try and determine an action brought against an estate of a decedent to enforce an agreement made by deceased to devise a certain share in his property. Jurisdiction in such cases is not confined to the district court sitting as a court of probate.

2. AGREEMENT TO DEVISE—*Specific Performance.*—A court of equity will enforce against the estate of a deceased person his promise made with a third-person to leave a definite share of his property in return for services rendered by the promisee; although the agreement contained an invalid contract of adoption.

3. SAME.—The evidence in this case examined and held to sustain the finding that deceased had agreed to leave to plaintiff a child's share of his estate.

4. Where deceased had promised to leave to one sought to be adopted a child's share of his estate, in return for her companionship and obedience, the fact that the promisee left his home and remained away for some time, or did not yield to him the obedience the contract demanded, cannot be taken advantage of by his heirs at law; he not having rescinded the contract.

5. EVIDENCE—*Res Gestae.*—In an action to enforce the performance of an agreement to devise, the evidence tended to show that in 1885 the agreement was made by the deceased, in consideration of the plaintiff's agreement to live with deceased and his wife and to render to them the services and affection of a child of her age. *Held,* that the acts and declarations of deceased, made after the agreement and while plaintiff was living with him and his wife, were part of the *res gestae,* and were admissible in evidence under Section 3126, Code of Civil Procedure, providing that "where also the declaration, act or omission, forms part of a transaction which is itself the fact in dispute, or evidence of that fact, such declaration, act or omission is part of the transaction."

*Appeal from District Court, Lewis and Clarke County; H. N. Blake, Judge.*

SUIT by Mattie E. Burns against Mary S. Smith, administratrix, and Norman B. Holter, administrator, of the estate of James M. Smith, deceased, and others. From a judgment for plaintiff, and an order denying a new trial, defendants appeal. Affirmed.

Statement of the case by the justice delivering the opinion.

This is an action for the specific performance of a contract. The defendant, Mary S. Smith, is the surviving widow of James M. Smith, and also his administratrix. Norman B. Holter is the administrator of said estate. The other defendants are the heirs at law of the said James M. Smith, who died intestate in Lewis and Clarke county on the 4th day of February, 1896. The material allegations of the complaint, and which were found in favor of the plaintiff in the special findings of fact made by the jury, are substantially as follows:

That about July 4, 1885, the plaintiff, at the solicitation of James M. Smith and Mary S. Smith, his wife, by an agreement made with the mother of plaintiff, went to live with the Smiths at their home. At that time plaintiff was 10 years

old. The Smiths were then, and at all times have been, childless. Plaintiff went to live with them under the agreement and with the understanding that, if James M. Smith was pleased with and liked the plaintiff after she had lived in their home as their child for a reasonable time, he would adopt her as his own child, so that she, on his death, should receive a child's share of his estate, the same as if she had been born his child in lawful wedlock. That plaintiff, with such understanding, went to live with the Smiths, and so continued to live with them, rendering to them such obedience and performing such services as a child of 10 years commonly renders and performs for its own parents, and obeying the Smiths as if they were her natural parents; that after the plaintiff had lived with the Smiths for about one year, and the said James M. Smith had become fully satisfied with and liked the plaintiff, and, having no children of his own, he entered into an agreement with the mother of the plaintiff, whereby, in consideration of said plaintiff, then a girl of 11 years of age, being surrendered to him, and in further consideration of such services as plaintiff would render him as his child, and the further consideration of the companionship of said plaintiff, he promised and agreed with the plaintiff's mother and the plaintiff that he would care for plaintiff as his own child, and adopt her, and further agreed that on his death she should receive a child's share of his estate. That in pursuance of said agreement the mother of the plaintiff then and there surrendered the care, custody and control of said plaintiff to the said James M. Smith, and that he took her and placed her in his household as his child, and continued to contribute to her care, maintenance, and support as his child until her marriage, on January 19, 1895, and thereafter continued to recognize her as his child up to the time of his death. The complaint further alleges that the plaintiff performed all of the conditions of the said contract on her part, and yielded the obedience to the said James M. Smith and his wife due from a child to its parents, treating and regarding them the same as she would her natural parents, relying upon the said James M. Smith's

declarations that she was his legally adopted child and heir; that she was known and recognized by the name of Máttie E. Smith, instead of her own name, Mattie E. Kates, and was introduced and declared by James M. Smith to be his adopted daughter and heir; that she called the Smiths "father" and "mother" while she lived with them; that she performed all the household duties such as a daughter usually performs for her own parents up to the time of her marriage, in January, 1895; that she was married to her husband at the home of, and with the full approbation of, said James M. Smith; that about July, 1886, a formal contract and deed of adoption was drawn up, at the special instance and request of said James M. Smith, whereby plaintiff was duly and legally declared to be adopted as the child and legal heir of said Smith, and that on his death she should receive a child's share of his estate; that said contract was signed by James M. Smith and the mother of the plaintiff, but that the same was never recorded; and plaintiff avers, on information and belief, that said deed of adoption has been destroyed by defendant Mary E. Smith, the surviving widow of James M. Smith. The complaint then alleges that plaintiff never knew that said deed of adoption was illegal and of no effect as a deed of adoption until informed by her counsel, after the death of said James M. Smith; that said Smith left an estate of about $55,000, and that the administratrix, the surviving widow, administrator, and the heirs at law of James M. Smith, deceased, claim to be entitled to all of the estate of said James M. Smith, and deny that plaintiff has any right or interest therein; that she presented her claim to the administrator and administratrix of said estate within the time prescribed by law, and that the same was entirely rejected. The plaintiff asks for a decree of the court establishing her right to a child's share of the estate of James M. Smith, deceased, under and in accordance with the contract and agreement entered into as aforesaid, and that said contract, when so established, be enforced against said estate and the defendants herein, and that upon the distribution of the estate she be entitled to receive one-half thereof.

. The answer denies all the material allegations of the complaint. The case was tried with a jury, and findings of fact were submitted to them, covering, as stated above, the material allegations of the complaint. All of the findings were in favor of the plaintiff, and were all adopted by the court, and judgment rendered in accordance therewith. From the judgment and an order of the court overruling defendants' motion for a new trial, this appeal is taken.

*Cullen, Day & Cullen,* for appellants.

Specification No. 45 assigned as error the action of the court in overruling the objection of the defendants to the introduction of any evidence upon the ground that the court had no jurisdiction. As this objection goes to the very foundation of the right of plaintiff to maintain this action, we will consider this first. The determination of the question as to who are the distributees of an estate of a deceased, properly comes under the administration of the estate and under the court having charge of the administration. Department 2 is by the established rules of the district court of Lewis and Clarke county the court of probate, and having reduced the estate to its possession, by issuing letters of administration, and the estate being still in the course of administration, that court had exclusive jurisdiction to determine the question of heirship of this plaintiff. (*In re Burton's Estate* (Cal.), 29 Pac. 36.) A proceeding to appoint an administrator is a proceeding *in rem*, and the tribunal first acquiring jurisdiction retains it to the exclusion of another court which might have acted if its process had been invoked. (*State* v. *Benton*, 12 Mont. 75; 1 Pomeroy's Equity Jurisprudence, Secs. 77, 347–350; Works on Courts, pages 68–72.) The Code of Civil Procedure prescribes the method of proceding for determining heirship and the method of acquiring jurisdiction in such proceedings. The principle *exclusio unius est exclusio alterius* fully applies, and this action not having been brought in accordance with the statute, the court had no jurisdiction to proceed in the matter. (Citing Secs. 2840, 2841 and 2842.) These sec-

tions of our code are taken from the California code, and the supreme court of that state has construed its statute ·in the cases of *Smith* v. *Westerfield*, 26 Pac. 206, and *In re Burton's Estate*, 29 Pac. 26. (Citing, also, *Siddall* v. *Harrison*, 73 Cal. 560; *Blythe* v. *Ayers*, 36 Pac. 522; *N. P. R. R. Co.* v. *Patterson*, 10 Mont. 106; *Kieley* v. *McGlynn*, 88 U. S. 503.)

Where authority to proceed in courts is conferred by statute, and where the manner of obtaining jurisdiction is prescribed by statute, the mode of proceeding is mandatory and must be strictly conformed to, otherwise the proceeding will be void. (23 Am. and Eng. Ency. of Law, 468; *Thatcher* v. *Powell*, 6 Wheat. 119; *Railroad Co.* v. *Telegraph Co.*, 112 U. S. 306.) ·Where a suit is brought to determine heirship before the expiration of a year after granting letters of administration, the court has no jurisdiction to proceed. (*Smith* v. *Westerfield, supra.*) The plaintiff claimed the right to bring her action as she did, and not under Section 2840, because she says that it is a proceeding in which chancery jurisdiction could be invoked long before the enactment of Section 2840 of our Code of Civil Procedure, and that inasmuch as our code does not assume to take away by express words this chancery jurisdiction, that the two jurisdictions are concurrent. We are not prepared to admit that equity has jurisdiction of this action in the absence of statute. In Massachusetts suit was brought in equity to enforce a contract similar to the one at bar, and the court held that a court of general equity jurisdiction had no jurisdiction to establish the claimant's rights. That the proper forum was the probate court. (*Ross* v. *Ross*, 123 Mass. 214, and 72 N. W. 59.) We contend that Article 2 of Chapter 11 of the Code of Civil Procedure was designed by the legislature to take the place of every other form of action, and that it operates as an abrogation of such, just as clearly as if it had been done by express words. (Citing 1 Pomeroy's Jurisprudence, Sec. 182; *Ex parte Harke*, 49 Cal. 465.) But if it were true, as contended by counsel for plaintiff, that the statutory remedy did not exclude the equitable remedy, unless there were express words of prohibition, it seems to us that

the result would be that the two remedies would be concurrent, and that upon familiar principles of jurisdiction, the court first assuming jurisdiction of the estate would be the one entitled to proceed and continue such jurisdiction throughout, where it is able to determine the whole controversy. (12 Am. and Eng. Ency. of Law, page 292; *Deck* v. *Gerke*, 12 Cal. 433, 73 Am. Dec. 558, note.) But we think the true solution of the question is, that our statute has assumed to provide the remedy and the method of acquiring jurisdiction, and that where it is apparent that this was the purpose of the legislature that the statutory remedy is exclusive. (Citing, *Hughes* v. *Case*, 1 Bland (Md.) 46; *Osborn* v. *Ordinary of Harris Co.*, 17 Ga. 123.)

Admitting the allegations of the complaint to be true, is the plaintiff entitled to recover a distributive share of the said estate as heir ? At the time of the execution of the alleged contract there was no statute in Montana relative to the adoption of children. Adoption was unknown to the common law and was repugnant to the principles thereof. (1 Am. and Eng. Ency. of Law (2nd Ed.), p. 726; Schouler's Dom. Relations, p. 314; *In re Johnson's Estate* (Cal.), 33 Pac. 460. Citing, also, Code Justinian, Lib. 8 Tit. 48; *Ex parte Chambers*, 80 Cal. 219, S. C. 22 Pac. 138; *Ex parte Clark*, 87 Cal. 641, S. C. 25 Pac. 967; *In re Stevens*, 83 Cal. 322; *Nugent* v. *Powell* (Wy.), 33 Pac. 23; *Webb* v. *Jackson* (Col. Ct. of App.) 40 Pac. 467; *Ferguson* v. *Jones*, 17 Ore. 204, S. C. 11 Am. St. Rep. 808; *Shahan* v. *Swan* (Ohio), 26 N. E. 222.) Where the adoption of children is regulated by statute, rights of inheritance can only be acquired, through adoption, by substantial compliance with the statutes. (*Renz* v. *Drury* (Kan.), 45 Pac. Rep. 70; *Tyler* v. *Reynolds*, 53 Iowa, 146; *Shearer* v. *Weaver*, 56 Iowa, 578; *Willoughby* v. *Motley*, 83 Ky. 297; *Wallace* v. *Long*, 105 Ind. 522; *Shahan* v. *Swan*, 48 Ohio St. 25, 26 N. E. 222; *Wallace* v. *Rappalye*, 103 Ill. 229.)

If, then, we are right in our contention that the action can be maintained only as one to specifically enforce a contract, the issues are (1) the execution of the contract; (2) its con-

tents; (3) performance by the plaintiff. The rules governing the admission of evidence in this class of cases are the same as govern in cases concerning ordinary contracts. The evidence admitted to which objection is made, which refers to the execution and contents of the contract, may be grouped into two general classes, viz: Acts and declarations of Mr. and Mrs. Smith relative to the position of the plaintiff in the family, and acts or declarations of Mr. Smith showing what he intended to do or had done for the plaintiff. The Code of Civil Procedure provides for the admission of declarations in the following cases: (Citing Secs. 3124, 3125, 3126 and 3129.) Under these provisions the declarations of another than the party affected can be admitted in three classes of cases only. (1) Declarations while holding the title in relation to the property in controversy; (2) Declarations forming part of the *res gestae*; (3) Declarations made against the declarent's pecuniary interest. It will not be contended that these alleged declarations come within the first class, as they were not made with reference to the property involved. But it is sought to bring them within one of the other two classes. Under our law, the declaration to be within the third class must be against the pecuniary interest of the party making it, a narrower construction of "against interest" than the common law rule. (*Poorman* v. *Miller*, 44 Cal. 275; *Sill* v. *Reese*, 47 *Id.* 342. Citing, also, *Mercer* v. *Macklin*, 14 Bush. 434; *Thistlewaite* v. *Thistlewaite*, 132 Ind. 355 (S. C. 31 N. E. 946); Jones on Evidence, Sec. 351; *Tilson* v. *Terwilliger*, 56 N. Y. 277; *People* v. *Vernon*, 25 Cal. 49 (S. C. 95 Am. Dec. 49; *Mack* v. *Porter*, 72 Fed. 236.)

*Sanders & Sanders*, for Norman B. Holter, Administrator (Appellant also).

*Carpenter & Carpenter* and *E. A. Carleton*, for Respondent.

The court had jurisdiction. That the district court sitting as a court of equity had exclusive jurisdiction of this action is

conclusively shown from an examination of the authorities, *infra*. Counsel for appellants, on this branch of the case, have argued a proposition entirely foreign to the case, viz., the question of heirship, the law for the determination of which is found in Article 2, Part III, Title XII, Code of Civil Procedure. Indeed, counsel truly say in their brief that this is an action "to compel the specific performance of a contract;" and, having correctly stated the nature of the case, they then proceed to an exhaustive discussion of the question for the determination of heirship under said Article 2. Hence it follows that the authorities cited by counsel to sustain their contention as to jurisdiction are not in point. It scarcely need be said that no probate court, either in this country or in England, has ever pretended to have jurisdiction to compel the specific performance of a contract, as that power is vested only in courts of general equity jurisdiction. The only exception, if such it may be called, is the provision of Section 2750, Code of Civil Procedure, which is as follows: "When a person who is bound in contract by writing to convey any real estate dies before making the conveyance, and in all cases when such decedent if living, might be compelled to make such conveyance, the court or judge may make an order authorizing and directing his executor or administrator to convey such real estate to the person entitled thereto." By the Constitution of Montana, Article 8, Section 11, "District courts have original jurisdiction in all cases in law and equity where the claim is for fifty dollars or more." Section 41 of the Code of Civil Procedure repeats this constitutional provision. Therefore, if the heirship law had attempted, which it has not, to establish an exclusive forum for the determination of such actions, such act would contravene the constitutional provision, *supra*. It is not contended that the district courts, before the adoption of the code, on July 1, 1895, did not have jurisdiction of such cases, since, prior to that time, we had no "heirship law." There is no instance where the mere granting of jurisdiction, without words of exclusion, ousts the former court of jurisdiction, and this principle has been enunciated

again and again by the supreme court of California, from which state our heirship law is taken bodily. (3 Pom. Eq. Jur. Paragraph 1153; *Perry* v. *Adams*, 26 Cal. 383; *Courtright* v. *Bair*, 30 Cal. 577; *Willis* v. *Farley*, 24 Cal. 499; *Delafield* v. *State of Ill.*, 2 Hill 159; Beach's Mod. Eq. Jur., Vol. 2, page 1111; *Burton* v. *Burton*, 79 Cal. 490; *In re Burton*, 93 Cal. 459; *Commonwealth* v. *Hudson*, 11 Gray 64). As already stated, our heirship law was taken bodily from California, hence we adopted that construction of the law which it had received in California by its highest courts at the time of its adoption, if such construction is reasonable. (*Stackpole* v. *Hallahan*, 16 Mont. 56; *State* v. *O'Brien*, 43 Pac. 1091.) Counsel quote voluminously from *In re Burton*, 93 Cal. 459, 29 Pac. 36, but they significantly omit the essential part of that decision, and which we confidently submit conclusively disposes of the question of jurisdiction. The decision states, page 37, "The statute (section 1664) exclusively authorizes and requires the court to determine the heirship to the deceased, the ownership of his estate and the interest of each respective claimant thereto or therein, which is not claimed adversely to the estate." Section 1664 is the California heirship law, identical with our own. The decision further says, on page 36, "But the provisions of the section (referring to the heirship law) are carefully limited to the ascertainment and determination of the rights and interests claimed in privity with the estate and are not applicable to rights and titles claimed adversely to such estate." Does plaintiff claim in privity with the estate or adversely to it? The term "privity" has a certain and well defined meaning in the law. "It denotes mutual or successive relationship to the same rights of property, and privies are distributed into several classes according to the manner of this relationship. Thus, there are privies in estate, as donor and donee, lessor and lessee and joint tenants; privies in blood, as heir and ancestor and coparcener; privies in representation, as executor and testator, administrator and intestate; privies in law, where the law, without privity of blood or estate, casts the land upon

another, as by escheat." (Greenleaf on Evidence, Vol. 1, paragraph 189.) It is apparent that plaintiff does not come within the meaning of any of these definitions, and hence her claim is not in privity with the estate, but is adverse to it. It not being a claim in privity with the estate, Article 2 *supra* of the Code of Civil Procedure does not apply. Plaintiff has the paramount claim of a creditor or equitable owner, which is only enforceable in a court of equity. (*Sharkey* v. *McDermott*, 91 Mo. 647.) Section 2603 of the Code of Civil Procedure provides that "All claims arising upon contracts, whether the same be due, not due or contingent, must be presented within the time limited in the notice, and any claim not so presented is barred forever." Under statutes quite similar it has been held that a probate court has no jurisdiction to determine disputed claims. (1 Woerner (Am. Law of Admin.) Sec. 153; *Tucker* v. *Tucker*, 4 Keys (N. Y.) 149; *McNulty* v. *Hurd*, 72 N. Y. 520; *Green* v. *Day*, 1 Demorest 50.) In this case it is the law relating to contracts rather than the law relating to adoption that is to prevail. (*Godine* v. *Kidd*, 19 N. Y. Supp. 335. Citing, also, *Theller* v. *Such*, 57 Cal. 447; *Bath* v. *Valdez*, 70 Cal. 360; *Barnard* v. *Wilson*, 74 Cal. 517; *In re Romland*, 74 Cal. 523.)

The authorities are abundant to the effect that in consideration of companionship and services to be given as by a child to a parent the agreement by the foster parent that the child so surrendered to him shall have an amount equal to a child's share of his estate is valid and will be enforced. Equity will enforce such a contract. (1 Am. Law of Admin. (Woerner) page 58 and cases cited; *Parsell* v. *Stryker*, 41 N. Y. 480, 485; *Healey* v. *Simpson*, 113 Mo. 340, and cases there cited; *Van Dyne* v. *Vreeland*, 11 N. J. Eq. 370; *Van Dyne* v. *Vreeland*, 12 N. J. 142; *Godine* v. *Kidd*, 19 N. Y. Supp. 337; *Rhodes* v. *Rhodes*, 3 Sandford, Ch. 279; *Jaffee* v. *Jacobson*, 48 Fed. 21; *Sharkey* v. *McDermott*, 91 Mo. 647; *Owens* v. *McNally*, 45 Pac. 711, and many cases there cited; *Brinton* v. *Van Cott*, 33 Pac. 218; *Johnson* v. *Hubbell*, 10 N. J. Eq. 332; *Townsend* v. *Vanderwerker*, 160 U. S. 184; Waterman on Spec. Performance, Par. 41.)

All the statements and declarations referred to were admissible, either to explain ambiguities, or show the relationship existing between plaintiff and her foster parents. (2 Wharton on Ev. Sec. 1158 and cases there cited; 2 Wharton on Ev. Sec. 1091; *Mack v. Mack*, 5 N. Y. Sup. Court (T. & C.) 528; *Doty* v. *Wilson*, 47 N. Y. 583; *Granai* v. *Arden*, 10 Johns. 296; *Smith* v. *Maine*, 25 Barb. 33; 1 Greenleaf on Ev. Sec. 147 *et seq.; Mut. Life Ins. Co.* v. *Hillman*, 145 U. S. 295 *et seq.; Beaver* v. *Beaver et al.*, 117 N. Y. 429.)

First: All of the declarations are a part of the *res gestae*. (Section 3126, Code of Civil Procedure; Jones on Evidence, paragragh 350, where it is said: "It is well settled that the main transaction is not necessarily confined to a particular period of time;" *Ranson* v. *Haigh*, 2 Bingham 103, where it is also said: "It is impossible to tie down to time the rule as to declarations; we must judge from all the circumstances of the case;" 1 Greenleaf on Evidence, paragraphs 108–147; *Wormouth* v. *Johnson*, 58 Cal. 623; *Ins. Co.* v. *Mosley*, 8 Wall. 397.)

Second: The declarations are admissible upon the ground that they are made against interest, within the meaning of Section 3129 of the Code of Civil Procedure. (*Van Dyne* v. *Vreeland*, 11 N. J. Eq. 370.) "Declarations of an intestate are admissible against his administrators or any other person claiming in his right." (1 Greenleaf on Evidence, paragraph 189; *Wormouth* v. *Johnson, supra; Tait* v. *Hall*, 12 Pac. 391; *Leyson* v. *Davis*, 17 Mont. 236 and 293.)

Third: The evidence is admissible under Section 3131 of the Code of Civil Procedure. The defendants deny the execution of the contract by their answer. To prove, then, that such a contract was entered into, became at once a vital issue in the case. The proof shows, by a half a dozen witnesses, that one of the defendants wrongfully and wickedly destroyed this contract, with the evident intention of defeating, if possible, plaintiff's claim.

PEMBERTON, C. J. The first question presented by this

appeal is as to the jurisdiction of the trial court.    Counsel for appellants contend that department II of the district court of Lewis and Clarke county, by the established rules of that court, is the court of probate of said county, and that, having reduced the estate of James M. Smith, deceased, to its possession by issuing letters of administration, and the estate being still in course of administration, that court had exclusive jurisdiction to determine the question of the heirship of the plaintiff.    This case was commenced and tried in department I of the district court of said county.

It is claimed that Section 2840, Code of Civil Procedure, gives exclusive jurisdiction to the probate court, or the district court sitting as a court of probate, to hear and determine this cause.

This section, among other things, provides that "any person claiming to be heir to the deceased, or entitled to the distribution in whole or in a part of an estate, may, at any time after the expiration of one year from the issuing of letters testamentary or of administration upon such estate, file a petition in the matter of such estate, praying the court or judge to ascertain and declare the rights of all persons to said estate, and all interests therein, and to whom distribution thereof should be made."

And after requiring the court or judge to give notice of the filing of such petition to the persons interested in the estate, and to take the proper proof of service of such notice, the section further provides that "the court or judge shall thereupon acquire jurisdiction to ascertain and determine the heirship, ownership and interest of all parties in and to the property of said deceased."

In support of the view that the district court, sitting as a court of probate, has exclusive jurisdiction to try and determine the right and title of parties claiming to be heirs of an estate, counsel rely largely upon *In re Burton's Estate,* 93 Cal. 459, 29 Pac. 36.    It is claimed that our code is borrowed from California, and that the California construction should prevail here. If we carefully examine *In re Burton's Estate,* we find the

court, after holding that the probate court may try and determine questions of heirship, uses this language in construing the statute quoted above: "But the provisions of the section are carefully limited to the ascertainment and determination of rights and interests claimed in privity with the estates, and are not applicable to rights or titles claimed adversely to such estates."

The question that confronts us here is, does the plaintiff claim to be an heir of the estate of the deceased? Or is not her claim adverse to the estate? She is not an heir at law, nor does she claim under or through an heir of the estate. Whatever claim she has, we think, results and comes to her under and through the contract alleged to have been made with the deceased in his lifetime as set out in her complaint. But whether the plaintiff claims as an heir of the estate, or adversely thereto, we think is not of paramount importance in determining the question of jurisdiction here presented. The section relied upon does not expressly confer exclusive jurisdiction upon the district court, sitting as a court of probate, to try and determine the questions therein enumerated; nor do we think exclusive jurisdiction to do so can be implied from the language of the section.

In discussing this question, Mr. Pomeroy, in section 1153, volume 3, of his work on Equity Jurisprudence, says: "One fundamental principle should be constantly kept in mind. It underlies all particular rules, and furnishes the solution for most of the special questions which can arise. In all those states which have adopted the entire system of equity jurisprudence, whatever be the legislation concerning the powers and functions of the probate courts, and whatever be the nature and extent of the subjects committed to their cognizance, the original equitable jurisdiction over administrations does and must still exist, except so far and with respect to such particulars as it has been abrogated by express prohibitory negative language of the statutes, or by necessary implication from affirmative language conferring exclusive powers upon the probate tribunals. This equitable jurisdiction may be

dormant, but, except so far as thus destroyed by statute, it must continue to exist, concurrent with that held by the courts of probate, ready to be exercised whenever occasion may require or render it expedient. This general principle, so familiar, so fundamental, running through all branches of the equitable jurisdiction, but so often lost sight of by American courts in dealing with the jurisdiction as applied to administrations, was admirably stated by one of the ablest of American judges: 'There is nothing in the nature of jurisdiction, as applied to courts, which renders it exclusive. It is a matter of common experience that two or more courts may have concurrent powers over the same parties and the same subject matter. Jurisdiction is not a right or privilege belonging to the judge, but an authority or power to do justice in a given case, when it is brought before him. There is, I think, no instance in the whole history of the law where the mere grant of jurisdiction to a particular court, without any words of exclusion, has been held to oust any other court of the powers which it before possessed. Creating a new forum with concurrent jurisdiction may have the effect of withdrawing from the courts which before existed a portion of the causes which would otherwise have been brought before them, but it cannot affect the power of the old courts to administer justice when it is demanded at their hands.' ''

In a note to this section the author cites a large number of California and other cases in support of the doctrine announced in the section.

Article 8, Section 11, of our Constitution is as follows: ''District courts have original jurisdiction in all cases in law and equity where the claim is for fifty dollars or more.''

Of the jurisdiction of such constitutional courts of equity, Mr. Beach, at section 1033, in his work on Modern Equity Jurisprudence, says: ''The jurisdiction of chancery over decedents' estates is well established, but in the several states of the union special courts having jurisdiction over such estates have been generally established, called 'probate courts,' 'orphans' courts,' 'surrogate courts,' and the like; and these

possess by statute nearly all the powers formerly possessed by the courts of chancery and ecclesiastical courts in England. Courts of equity have, however, concurrent jurisdiction; and, although their equitable jurisdiction may have been displaced in ordinary cases by the probate system, yet it is not abrogated by statutes conferring jurisdiction on probate courts. And it has been held that an act providing that probate judges shall have exclusive original jurisdiction in matters concerning decedents' estates is void, as in contravention of an organic act conferring upon other courts chancery as well as common-law jurisdiction." A great many cases are cited in the notes to this section in support of the views of the author.

We think it cannot be claimed that the district court, as a court of general original common law and equity jurisdiction, did not, at least, have concurrent jurisdiction of this action with the district court sitting as a probate court. The learned judge who presided over the probate department of the district court when this suit was instituted held that the court of probate had no jurisdiction. Whether this view of the matter is right or wrong, it is not necessary now to determine. In the great number of cases reported and cited in the briefs, of the same character as this, we have not discovered that it has been questioned that courts of general chancery jurisdiction were the proper tribunals for trial. *Owens* v. *McNally* (Cal.) 45 Pac. 710, decided by the supreme court of California July 23, 1896, is a case for specific performance of a contract, and is very like this one in its main facts. In that case the general equity jurisdiction of the superior court was not questioned, and this case was decided long after *In re Burton's Estate.*

We deem it unnecessary to examine in detail the great number of authorities cited by counsel, pro and con, upon this question. We think the conclusion that the trial court had jurisdiction of this cause is in harmony with the views of this court expressed in *Chadwick* v. *Chadwick,* 6 Mont. 566, 13 Pac. 385; *State ex rel. Bartlett* v. *Second Judicial District Court,* 18 Mont. 481, 46 Pac. 259; and *In re Higgins' Estate,*

15 Mont. 474, 39 Pac. 506. All these cases define and limit the jurisdiction of district courts sitting as courts of probate.

Counsel for the appellants attacked the complaint in the court below by general demurrer, and now urge in this court that upon the allegations thereof the plaintiff is not entitled to relief. It is urged that, at the time of the execution of the written contract of adoption alleged in the complaint to have been made by and between the mother of plaintiff and the deceased, there was no statute in Montana authorizing the adoption of children, that such contracts were not permissible under the common law, and that, therefore, the plaintiff cannot inherit any part of the deceased's estate, under the facts stated in her complaint.

In answer to this proposition it is manifest that counsel for the plaintiff are not seeking to recover under the written contract of adoption. It is not contended that plaintiff was legally adopted by deceased by such contract. It is contended that the deceased intended thereby to adopt the plaintiff as his child and heir, and thought he had done so, but that, as such contract was not authorized by law, there was in reality no such adoption of plaintiff. But it is further urged on the part of the plaintiff that under the terms of the contract, and allegations of the complaint, it is shown that plaintiff was to receive or have a child's share of the estate of the deceased at his death. It is alleged that plaintiff performed her part of this contract, and that the deceased partly performed his part thereof, but died without having conveyed a child's part of his estate to the plaintiff. It is claimed on the part of plaintiff that, although the contract is invalid as a contract of adoption, it is good and sufficient as a contract to leave the plaintiff a child's share of the deceased's estate at his death. The complaint alleges, in addition to the deceased's agreement to adopt plaintiff, that he "further agreed that on his death she should receive a child's share of his said estate." The question then is, will a court of equity enforce this part of the contract if it shall be satisfactorily proved?

In *Jaffee* v. *Jacobson*, 1 C. C. A. 11, 48 Fed. 21, the court,

discussing this question, says: "We concede the law to be that a court of equity will specifically enforce a promise to leave to another the whole or a definite portion of one's estate, as a reward for peculiar personal services rendered or other acts done by the promisee, which are not susceptible of a money valuation, and were not intended to be paid for in money, provided the consideration has been substantially received at the promisor's death; and it is no objection to the enforcement of such a contract that it was entered into with a third party for the promisee's benefit, if the latter has acted under it and executed it. Such seems to be the substance of the rule fairly deducible from the authorities cited and relied upon by appellant's counsel. (*Rhodes* v. *Rhodes*, 3 Sandf. Ch. 279; *Van Dyne* v. *Vreeland*, 11 N. J. Eq. 371; *Sutton* v. *Hayuen*, 62 Mo. 102; *Sharkey* v. *McDermott*, 91 Mo. 648, 4 S. W. 107; *Haines* v. *Haines*, 6 Md. 435; Pomeroy Cont. Sec. 114, and citations.)" In *Godine* v. *Kidd*, 19 N. Y. Supp. 335,—a case almost exactly like the one at bar, especially in the particular that the adoption of a child was attempted in the absence of a statute authorizing it,—the court said: "Even though we should assume, therefore, that none of the arrangements between the parties was of original binding obligation upon the defendant's parents, yet the subsequent performance and fulfillment thereof by defendant and her parents, so that thereby the Knapps actually got all they bargained for, would furnish a sufficient consideration to support their promises as effectually as if the agreement had been of original binding obligation. What the Knapps bargained for was, at the very least, forbearance by and on the part of defendant's parents of some of their rights, and was an adequate and sufficient consideration for their promises and undertakings. * * * The adequacy of the consideration is for the parties to consider at the time of making the agreement,— not for the court when it is sought to be enforced. Here, with the consent of the defendant's parents, the Knapps obtained the privilege of supervising and directing the defendant's education, her life, habits, and tastes, the formation

and development of her character, and the privilege of treat-
ing her as their own daughter, and of being regarded and
loved by her as her parents. They at the ·time were child-
less, and were, no doubt, actuated by the same feelings and
instincts which ordinarily move lonely and childless people to
adopt as their own the child of others; and that there was re-
sultant benefit to them is abundantly established by the evi-
dence. The defendant not only regarded them as her parents,
but in all respects conformed to the strictest requirements of
an affectionate and dutiful child. Upon these facts, who
would question the worth, adequacy, and sufficiency of the
consideration received by the adopting parents? Lives that
are drear and blank are thus oftentimes cheered and animated,
and filled with new hopes and ambitions, fresh impulses, and
awakened energies. These are the contributions of youthful
love and affection and companionship to childless old age. But,
whether or not the results expected from adopting the defend-
ant were in all respects realized, this in no way affects the
adequacy of the consideration moving from the parents of the
defendant, and supporting the promise made by the Knapps.''

In *Sharkey* v. *McDermott*, 91 Mo. 647, 4 S. W. 107, the
plaintiff, when a child, was given by her mother, a widow, to
James and Catharine McLaughlin, under an agreement that
the McLaughlins would care for her and adopt her as their
child, ''and leave her their property at their death.'' They
neglected to formally adopt the plaintiff. James McLaughlin
willed all his property to Catharine, and died. Catharine died
suddenly, leaving no will. The plaintiff sued the heirs at law
of Catharine McLaughlin for a specific performance of the
contract made with the McLaughlins. In this case, speaking
of that part of the contract of the McLaughlins to leave the
plaintiff their property at their death, the court said: ''But
the rights of plaintiff, if any, in this case, do not spring either
from the general law applicable to parent and child, or from
said statute authorizing the adoption of children, for the rea-
son that plaintiff was not the daughter of these parties by na-
ture, nor had she been formally adopted by them by deed duly

executed as the statute requires. Her rights in the premises, if any, depend, we think, entirely upon said agreement, and the action had thereunder by the parties thereto. .This agreement was not merely and solely one to adopt the plaintiff, but was in part to leave the plaintiff the property at their death. The fact that the parties, and each of them, may have failed and neglected to execute it, so far as the adoption was concerned, should not, we think, exonerate them from its further obligation to transfer their property, when they could no longer use it, to plaintiff; but if the plaintiff is without the status of an adopted child, through no fault of her own, but through the neglect of those so promising, this is only additional ground for the enforcement of the contract as to the disposition of the property, if the necessary equitable facts and circumstances are properly alleged."

In *Healey* v. *Simpson*, 113 Mo. 340, 20 S. W. 881, the court held that where a written contract for the adoption of a child is invalid because not executed in conformity with the law of the state, yet where such contract also provided that the child should have and inherit from the estate of the promisors in the same manner and to the same extent that a child born of their union would inherit, such part of the contract would be specifically enforced in favor of the heirs of the promisee against the heirs of the promisors. In this case the court cites a large number of authorities, and sums up its views in the following forcible language: "The surrender by the mother of all control of the child, and the services and companionship of the latter, constituted valuable considerations for the promise of Brewster and his wife that she should 'have and inherit from the estate of said parties * * * in the same manner and to the same extent that a child born of their union would inherit.' The influences of a child of tender years in the home circle are too sacred and holy to be estimated in dollars and cents. And, when the mother sent her child to dwell in another family in a distant state, she yielded much affection and love; and Brewster by the same act gained the companionship of one who added much, no doubt, to his

enjoyment of life. The sundering of natural ties, and the formation of artificial ones, for the enjoyment and gratification of the party at whose instance this is done, is held, and ought to be held, to be such a consideration as the courts will recognize as valuable, where the other party has in good faith acted on and carried out the agreement on his part. This is upon the principle that the parties cannot be put in *statu quo.* In the very nature of things, nine years in the life of a child so change conditions that it is out of the power of an earthly tribunal to restore the parties to their original situation and environment, and the courts therefore compel them to stand upon and abide by the record they have made.''

In *Owens* v. *McNally* 45 Pac. 710 (Cal.), the supreme court of California hold that ''a parol contract by decedent to leave plaintiff all his property, real and personal, if she would leave her home, and thereafter 'live with him and care for him,' is not so vague and uncertain as to preclude specific performance in an ordinary case.''

In this case the court adopts with approval the following language of the supreme court of New Jersey, found in the leading case of *Johnson* v. *Hubbell*, 10 N. J. Eq. 332: ''There can be no doubt but that a person may make a valid agreement binding himself legally to make a particular disposition of his property by last will and testament. The law permits a man to dispose of his own property at his pleasure, and no good reason can be assigned why he may not make a legal agreement to dispose of his property to a particular individual, or for a particular purpose, as well by will as by conveyance, to be made at some specified future period, or upon the happening of some future event. It may be unwise for a man to embarrass himself as to the final disposition of his property, but he is the disposer by law of his own fortune, and the sole and best judge as to the manner and time of disposing of it. A court of equity will decree a specific performance of such an agreement, upon the recognized principles by which it is governed in this branch of its jurisdiction.''

This case collates what the court calls a ''multitude of au-

thorities," and, after considering them thoroughly, the conclusion is reached that the rule announced "is supported by the overwhelming weight of authority."

In most of the cases quoted above the promisors attempted in some manner to defeat the contracts entered into by them, and the courts, notwithstanding, enforced them—in several instances against the heirs and assignees of the promisors. In this respect the case at bar, as stated in the complaint, is a stronger one than any case cited above; for, as far as the allegations of the complaint are concerned, or any inference therefrom, the promisor in this case never in his lifetime sought to evade or defeat the contract it is alleged he made with, or for the benefit of, the plaintiff, but, as far as can be inferred, even from the complaint, died believing he had, by a proper contract, adopted the plaintiff, and contracted therein to leave her a child's share of his estate at his death; so that we are of the opinion that the contract on the part of the deceased to leave to the plaintiff a child's share of his estate is sufficiently alleged in the complaint, and that such contract should be enforced, if sufficiently established by the proof. We come to this conclusion more readily as we are of the opinion that the parties to the alleged contract never contemplated that the services of plaintiff were to be or could be compensated in money, and because the parties cannot now be placed in *statu quo*. Besides, there are no intervening rights of third parties or innocent holders of the estate involved. There is nothing harsh or hurtful to anyone in such proceeding. No fraud or imposition is alleged, or hinted at, even, in the record. So that if the contract as alleged is clearly established, as we think it must be, it should, in equity, under the great weight of authority, be enforced. (*Van Dyne* v. *Vreeland*, 11 N. J. Eq. 370; *Brinton* v. *Van Cott*, 33 Pac. (Utah), 218; *Townsend* v. *Vanderwerker*, 160 U. S. 184, 16 Sup. Ct. 258; *Pflugar* v. *Pultz*, 43 N. J. Eq. 440, 11 Atl. 123.)

Is the contract to leave to the plaintiff a child's share of the estate of deceased at his death sufficiently established by the evidence to authorize a court of equity to decree a specific per-

formance thereof? Mr. Foot, an insurance agent, drew the contract. He is not certain, but thinks there was something in the contract about making plaintiff Smith's heir. He has no positive recollection as to whether the contract provided that she should inherit as Smith's own child. He knows that Smith wanted a contract showing his intention to adopt plaintiff. The mother of the plaintiff testifies positively that the contract did contain the provision that plaintiff should have a share of his estate at the death of Smith, as his child—his only child. She says Mr. Foot read the contract over to her twice after it had been signed by the Smiths. We see no such conflict as is contended for between the evidence of these two witnesses. Mr. Foot does not recollect as distinctly as the mother. He does not contradict her. It is not strange that his memory should not be as good as the mother's in respect to the provisions of this contract. He was perhaps in the habit of drawing contracts for people. It is fair to suppose the mother was not. Mr. Foot had no particular reason for remembering the terms of this contract. The mother did. It was to her, perhaps, the most important document she ever executed. It concerned immediately the welfare and happiness of her daughter. It is not strange, then, that the terms of this contract, which was to influence so largely the happiness and destiny of her daughter, should make a deep and lasting impression on her mind. And, besides, if, as Mr. Foot says, Mr. Smith wanted a contract written showing his intention to adopt plaintiff, it is fair to presume that the contract, as prepared, did contain something about making plaintiff his heir, or providing that she should have a child's share of his estate at his death. Such would have been the effect of a legal adoption. From Mr. Foot's evidence, Smith wanted and intended to legally adopt plaintiff. But, if any real conflict existed between these two witnesses, let us look further at the evidence. This written contract, as shown by the record, has been lost or destroyed. It is shown by the neighbors of the Smiths—very many of them—in substance, that deceased dearly loved the plaintiff. He spoke of her to some as his

heir—as his adopted daughter. He introduced her to others as his daughter. He so treated and cared for her for years. Then, when she was to be married, he insisted it must be at his house. She married with his consent and approval. She received his blessing as if his own child. He gave to her a home as a man would to his own daughter. When plaintiff's child was born, the deceased congratulated and felicitated himself upon the happy event of being a grandfather. And it seems that in a biographical sketch of Mr. Smith, published in the history of Montana, he states that he had adopted plaintiff. From all the declarations and acts of the deceased, as shown by the record, it seems clear to our minds that deceased not only intended to make such a contract as would permit the plaintiff at his death to have a child's share of his estate, but that he did make such contract. The record shows that the deceased entertained great affection for the plaintiff. She occupied perhaps a closer relation and position to his heart, in his old and childless days, than any other person on earth. It is not to be wondered at, then, that he should desire to make suitable provision for her happiness and maintenance. A jury has found that he did make such a contract as would carry out his intention and desire in this respect. Hon. Henry N. Blake, the judge who tried the case, approved the findings of the jury in this respect, as well as in every issue submitted to them. Hon. Henry C. Smith, the successor in office of Judge Blake, heard the motion for a new trial, and overruled it; holding, in an ably-written opinion, that the contract in question was clearly established by the proof. After the finding of this issue in favor of the plaintiff by the jury, and the action of two chancellors in adopting and approving such finding as clearly established by the proof, we must hesitate to disturb and reverse such action and result. We think such disposition of the case is but the carrying out of the cherished intention and desire and contract of the deceased in relation to his estate. The deceased had the right to dispose of his property as he pleased, and his contract to dispose of it, when free from fraud, imposition, and surprise, and being reasonable and

moral, will be carried out and enforced by a court of equity. This is equity. This is right. It is real justice to carry out and enforce such contracts according to the intention of the parties in such cases. (*Leyson* v. *Davis*, 17 Mont. 220, 42 Pac. 775.)

Counsel for appellants contend that the evidence of the witnesses as to the acts and declarations of deceased with reference to the relation plaintiff sustained towards him while living in his family were inadmissible. We think the *res gestae* extended over the entire time between July, 1885, when the contract is alleged to have been made, to the death of the deceased. The conduct of the parties towards each other during that entire time is part of the transaction, and whatever either party did or said during that time which sheds light upon the matter, and aids in disclosing the relations the parties sustained, and understood that they sustained, towards each other, must be construed as part of the *res gestae*. We think this evidence was admissible, under Section 3126, Code of Civil Procedure, which is as follows: "Where also the declaration, act or omission, forms part of a transaction which is itself the fact in dispute, or evidence of that fact, such declaration, act, or omission is part of the transaction." In nearly all of the cases cited and quoted above, in cases like this, the acts and declarations of the parties explanatory of their relations towards each other, and disclosing and explaining the conditions, terms, and contracts supporting these relations, have been admitted in evidence.

Counsel for appellants say plaintiff abandoned the performance of her part of the contract with the deceased, or did not sufficiently perform the same to authorize a decree of specific performance. It is also claimed that plaintiff did not yield that obedience to the Smiths that the contract relied on demanded of her.

It is in evidence that on one or more occasions the plaintiff left the home of the Smiths, and on one occasion remained away some time. It is in evidence that plaintiff and Mrs. Smith did not always agree and get along harmoniously. Mr.

Smith, it seems, was aware of this, and regretted it. It is not necessary for us to discuss the question as to who was at fault —the child or Mrs. Smith.   It is in evidence that Mr. Smith on one of these occasions went after plaintiff, and brought her home; saying at the time he would have her back if it cost him half of his property.   The evidence of some of the witnesses is to the effect that Mr. Smith was grieved that his wife and plaintiff sometimes disagreed.   But we agree, in relation to these questions of nonperformance of the contract and want of proper obedience on the part of plaintiff, with Judge Smith in his able opinion overruling appellants' motion for a new trial, that these were matters of which Mr. James M. Smith was the sole judge.   Smith had no intention on account of these things to rescind the contract.   Long after the absences of plaintiff from Smith's home, which are urged as showing an abandonment or nonperformance of the contract on the part of plaintiff, she lived at the Smith home, treated and regarded as a daughter by Smith, without any intimation on his part that he was dissatisfied, or intended to rescind the contract, and so lived there, treated as Smith's child, until her marriage.

We believe we have substantially treated, if not in detail, all the questions presented by this appeal.   Some minor matters, such as who destroyed the contract, whether deceased left a will, and whether plaintiff was driven from the Smith home by ill treatment of Mrs. Smith, we think immaterial. We think that it is sufficiently alleged in the complaint, and established by the proof, that deceased contracted to leave plaintiff a child's share of his estate at his death—conditioned, of course, upon her performing the contract on her part.   We think it is shown that she did perform the contract to the satisfaction of the deceased, the sole judge of those matters.   We believe it was the desire and intention of the deceased that the plaintiff should have a child's share of his estate at his death, and that he contracted, and intended to contract, to that effect.   We see no reason why, under the facts and circumstances of this case, the wishes and contract of the deceased in

the premises should not, equitably, and in justice to all parties interested, be carried out and enforced.

The judgment, decree, and order appealed from are affirmed.

*Affirmed.*

HUNT and PIGOTT, JJ., concur.